UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN A. BORDERS,

       Plaintiff,

vs.                                                              CIVIL NO.:  05-CV-73293-DT

COMMISSIONER OF                          HON. GERALD E. ROSEN
SOCIAL SECURITY,                           MAG. JUDGE WALLACE CAPEL, JR.

       Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.**      **RECOMMENDATION**

It is recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and enter judgment for Defendant.

**II.**    **REPORT**

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits [DIB].  Plaintiff filed for benefits on August 4, 2000, alleging that he has been disabled and unable to work since November 29, 1999, due to back problems and residuals from back surgery.  (TR 56-58, 64).  The Social Security Administration [SSA] denied benefits initially on November 21, 2000.  (TR 43-49).  A de novo hearing was held on December 12, 2001, before Administrative Law Judge [ALJ] Alfred Varga. (TR 194-212).  In a decision dated January 22, 2002, the ALJ found that Plaintiff could perform some sedentary work.  (TR 165-69).  Accordingly, Plaintiff was found not disabled.  (TR 169).

Plaintiff requested review by the Appeals Council and on November 5, 2002, the Appeals Council remanded the case to the ALJ, because the ALJ did not adequately address the medical opinions of Todd T. Best, M.D., nor did he explain the weight given to same. (TR 178-80). On May 14, 2004, a second hearing was held before the ALJ. (TR 213-34). In a decision dated September 15, 2004, the ALJ found for a second time that Plaintiff could perform some sedentary work. (TR 17-28). Accordingly, Plaintiff was found not disabled. (TR 28). On July 15, 2005, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (TR 6-8). Plaintiff then made this appeal to district court.

## A.     PLAINTIFF'S TESTIMONY

### 1.     December 12, 2001 Hearing

Plaintiff testified that he currently lives in Waterford, Michigan. (TR 197). He stated that he completed the twelfth grade in 1981, but was already working prior to graduation. (TR 197-98). He reported that he last worked November 29, 1999. (TR 198). He explained that he stopped working due to worsening of his pain symptoms, and he could no longer stand eight hours a day as his job required. Id. Further, he stated that his doctor gave him greater restrictions and General Motors [GM] did not have a position for him with the new restrictions. Id. Plaintiff testified that

> [i]f they would have allowed me to come and go, and use the restroom as I felt the urgency to do so, I think possibly, you know, if the load was - - and I was able to lay down, you know, a few minutes within the hour, you know, every hour I'd say maybe ten minutes within the hour, you know, every hour I'd say maybe ten minutes to where I could sprawl out, and stretch out, and take the load off my spine, that's the biggest problem. . .

(TR 203).

He stated that he always worked full-time for GM, except for layoffs and missing time to see doctors. (TR 198). He stated that he missed "a lot" of time and used up his sick days. (TR 198-

2

199).  He explained that he only had five sick days each year, and he used three or four sick days a month due to his back problems.  Id.  He stated that he used up his sick days by returning home from work, or by staying home and going to see his doctor.  Id.  He testified that when he would go back home, he would lie down and take medication.  Id.

Plaintiff testified that he was in a motorcycle accident in 1980.  Id.  He explained that he was "riding a dirt bike, and flipped, and landed on [his] tailbone, and stopped dead, and busted [his] spine."  Id.  Subsequently he had two surgeries and nerve damage.  Id.  He stated that he has fusion and Herrington rods put in his back.  Id.  He stated that "[a]bout seven inches of [his] spine is fused together."  Id.

Since the accident, he stated that his back has always given him problems.  Id.  He stated that he was told not to go back to the same line of work, but reported that with his limited education, he did not see an alternative.  Id.  He stated that his problems have been advancing and his nerve damage is worsening.  (TR 199-200).  He explained that the nerve damage causes pain in his legs and hips, as well "bathroom problems."  (TR 200).  He testified that the pain is in his lower and mid-back, and that he has weakness and numbness in his legs, and shooting pain in his hips.  Id.

Plaintiff testified that he has pain daily that gets progressively worse throughout the day.  Id.  He stated that he takes the following medications for pain: muscle relaxants, Flexeril, Nalfine, and Fenoprophen.  Id.  He stated that the medications relieves the pain if he lies down, but they do not eliminate the pain.  Id.  He stated that the muscle relaxers cause him drowsiness and he thinks the anti-inflammatories are damaging his liver.  Id.  He stated that the Flexeril does not cause side-effects.  (TR 201).  He then stated that he gets dry mouth, a "sore side," and constipation from his medications.  Id.  He stated that he has problems with his bladder and bowels regardless.  Id.

3

He explained that he has been having problems with his bladder and bowels since his accident, but they have worsened over time.  Id.  In the beginning he was constipated, but more recently his urgency has become the bigger problem.  Id.  He stated that the problems with urgency began in the last six or seven years and that this was interfering with work.  (TR 201-02). He was fired for walking off the line to go to the bathroom, but his union fought his termination, and he went back to work after three weeks.  (TR 201-202).

Plaintiff testified that as far as his urgency, "[i]t all varies on activity, diet, stress, [and] pain."  (TR 202).  He stated that it varies and some days his urgency might be a problem, and other days he might be constipated.  Id.  On a bad day, he reported that he has to use the bathroom "a couple times an hour."  Id.  On a good day, he still has to use the bathroom once an hour.  Id. Although he stated that it varies, he reported that "the whole week consists of one or the other of those problems."  (TR 202-203).

Plaintiff testified that he lies down during the day, depending on activity, for ten minutes to an hour and half each day and that he cannot sit in a chair more than an hour, "usually less than an hour."  (TR 203).  He stated that when he is at home, even when he is watching television, he has to get up, and when he does, initially he walks hunched over and limps.  Id.  He stated that he can stand for an hour or less comfortably.  (TR 204).  He stated that he cannot walk far, but tries to walk around the block in his neighborhood in an attempt to stay fit.  Id.  He stated that he can lift fifteen or twenty pounds, but not constantly.  Id.  He stated that if he has to, he can grab a bag of potatoes, laundry, or laundry soap.  Id.

He stated that he shares the chores with his girlfriend.  Id.  He stated that he tries to do "an hour's worth" of dusting, clean the mirrors, or do the dishes, so that he is not a burden.  Id.  He

stated that he never cleans for more than an hour.  (TR 205).  He stated that he never vacuums, because they have stairs that need to be vacuumed, and it is too uncomfortable for him to carry the vacuum.  Id.

He stated that he mows his small yard with a self-propelled mower, and he takes his time. Id.  He stated that he also uses a gas powered trimmer, but his girlfriend helps with the more detailed yard work and leaves.  Id.  He stated that in total, it takes him from one hour to one and a half hours, at which point he is exhausted.  Id.  He reported that he does yard work about once a week, and that he feels terrible after completing it.  He develops pain in his lower back and hip, and his neighbors comment on his limping. (TR 205-06).  After completing yard work, he reported that he goes inside the house to lay down, often on the hardwood floor, and is done for the day.  (TR 206).  He stated that he does not think that there is anything he could do for eight hours without having to lay down. Id.

### 2.      May 14, 2004 Hearing[1]

Plaintiff testified that he is divorced, has two children, and lives with his girlfriend in a home that he owns.  (TR 216).  He stated that his daughter lives with her mother and his thirty-year-old son lives independently.  Id.  Plaintiff stated that he has not worked or taken any classes since the previous hearing.  Id.

Plaintiff testified that he was still treating with Dr. Best, and only sees him once or twice a years, because he sees a primary care physician for his medication and other basic medical needs. Id.  He stated that Dr. Best just does an evaluation and checks his progress.  Id.   In addition, he stated that Dr. Best does more extensive testing, such as [full name of test] EMGs, than his primary

---

[1]To the extent Plaintiff repeated testimony from the previous hearing, it has been omitted here.

5

care physician can perform.  (TR 217).  He testified that Dr. Best told him that there is nothing he can really offer Plaintiff at this point, because neck surgery is always risky.  Id.  Further, he stated that he provides his own physical therapy at home, which both Dr. Best and his primary care physician prescribed.  Id.

Plaintiff explained that his neck problems are new, although they began acting up as early as 1988.  (TR 217-18).  He stated that he saw a doctor at GM as well as Dr. Henderson, an orthopedic surgeon.  (TR 218).  Plaintiff stated that Dr. Henderson worked on his back, but it has "steadily gotten worse."  Id.  He stated that his neck problems were

> just verified by Dr. Best with a CAT scan and an - - well, the EMG probably didn't show that, but I have a collapsed disk between C5 and C6 in [his] neck, and what they call a hard rod which is a passageway where a nerve runs in [his] spine at the same disk that's filling full of bone fragments or spurs and a calcium deposit that's pinching off the nerve.

Id.  He stated that he now has headaches in the back of his head, as well as pain and numbness in his arms and shoulders, which began in the fall of 2003.  Id.  He stated that he always had clicking and popping in his neck, all the way back to 1988, but the headaches, pain, and numbness are constant now.  (TR 219).  He stated the problems have continued even though he stopped working.  Id.  He stated that "[i] doesn't matter what I'm doing.  Resting, you know, sleeping over the night, I get up in the morning and I'm knotted up and stiff."  Id.

Plaintiff reported that since the prior hearing his back pain has been the same.  Id.  He stated that his back pain and hip pain have been bad for years.  Id.  When asked how long he could sit in a chair, such as that provided to him at the hearing, Plaintiff replied that he could sit for about fifteen minutes, and then he would have to alternate positions by standing or walking around.  Id.  He stated that he could stand for about fifteen minutes, too, before he has to sit down or bend.  (TR 220).  He

6

stated that he no longer walks around his neighborhood block and is not sure how long he could walk, but estimates maybe fifteen minutes.  Id.

Plaintiff could not recall Dr. Best's lifting restrictions, but testified that he could probably lift ten pounds "once in a while . . . comfortably."  Id.  He stated that he could carry ten pounds from his kitchen counter to his refrigerator, but not all day.  Id.  Plaintiff stated that he tries to do some dusting, straightening up, and dishes, but cannot sustain that activity for longer than fifteen or twenty minutes.  (TR 221).

Plaintiff testified that he is still taking pain medication, namely, Celebrex, an anti-inflammatory, and Flexeril, a muscle relaxer.  Id.  He stated that they "just [take] the sharp edge off," but he is still constantly uncomfortable.  Id.  He stated that he does not want to be "worthless" on a drug such as Darvocet; certain drugs make him sleepy, and he does not want to sleep all day.  (TR 221-222).

He explained that the doctors have recommended stronger pain medication, but because of his age and potential liver damage, he prefers to stay off stronger medications.  (TR 222).  He stated that he also lays down during the day, once an hour for about ten minutes at a time, and also does stretches to relieve pain.  Id.  He stated that after sustaining housework or other activity he would need to lie down within the hour.  (TR 222-23).

Plaintiff testified that he drove to the hearing himself and that it took him about forty-five minutes.  (TR 223).  Thus, the ALJ pointed out that with drive time and the length of the hearing, Plaintiff would be active for about two and half hours without being able to lie down.  (TR 223-24).  Plaintiff explained that when he got home he would be uncomfortable and in pain with his pinched nerves.  (TR 224).  In addition, he stated that he would be fidgety, jittery, and nervous.  Id.  He

7

stated that he would need to stretch out and lie down, but only for ten minutes, when he gets home from the hearing. Id.

Plaintiff stated that he normally only takes short trips in the car, to visit his daughter or to a store to buy milk and bread. Id. He stated that he never takes trips where he will be away for more than three hours. Id.

Plaintiff testified that he still has problems with a need to go to the bathroom and goes every ten to fifteen minutes at home. Id. He explained how he got ready for the hearing in terms of bathroom use:

> for this 9:15 appointment, I got up at 4:00. I've got a 45 minute drive, and I got up at 4:00 so I could - - that's how I set up my day. If I do have doctor's appointment or anything, I try to make them afternoon appointments because I need that much time to be up. I can shave and shower and be ready quicker than that, but I need to make sure that I've - - the bathroom practices, you know, I've gotten out of the way, you know? I had three or four hours to go two or three times and make sure I pretty much got my system cleared out before I would ever chance to [sic] something like this. I was almost going to call down and see if I couldn't get an afternoon appointment for here, you know, but I just got up early and went with it. That's how I have to plan any doctor appointment in the morning or anything.

(TR 225).

### B.   MEDICAL EVIDENCE

Examination of the parties' cross-motions for summary judgment reveals that an additional recitation of the Plaintiff's medical evidence would be repetitive. The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[2]

---

[2]See Subpart E, infra, at 14.

8

## C.      VOCATIONAL EXPERT'S TESTIMONY

### 1.      December 12, 2001 Hearing

Michael Eric Rosko, a vocational expert [VE], testified at the hearing.  (TR 206-11).  He classified Plaintiff's past work as light to medium and unskilled.  (TR 207).  The VE testified that Plaintiff had no transferable skills.  Id.  The ALJ presented a hypothetical question to the VE regarding whether a claimant with Plaintiff's age, sex, educational level, and work experience, whose testimony was credible, was capable of Plaintiff's past relevant work.  (TR 207-08).  The VE testified that Plaintiff would not be capable of doing his past work or any other work due to his need to use the bathroom more than once each hour and the need to lie down two days a week for ten minutes each hour in order to manage symptoms.  (TR 208).

The ALJ posed a second hypothetical question to the VE regarding whether a claimant with Plaintiff's age, sex, educational level, and work experience, who

> could perform no more than a sedentary or a sit down-type job, but in addition to the job being sedentary, that it would afford the option for sitting or standing off and on, and the job's not being performed at unprotected heights requiring any driving, or climbing, or work around dangerous or hazardous machinery, with regard to the issue of urgency and within the parameters of this hypothetical, what kind of jobs that would give, allow an individual the most amount of freedom, would fall within the parameters of this hypothetical?

(TR 208-09).  The VE testified that under these limitations, the jobs that would allow the most amount of freedom would not be on an assembly line or conveyor line but  at an independent work station.  (TR 209).  The VE testified that the following entry-level, sedentary and unskilled jobs with a sit/stand option existed in the region: visual inspector and simple assembly production, 7,000 positions.  Id.  Further, the VE stated that "these jobs are learned by a short demonstration and typically a person becomes proficient at these types of jobs within a day or two."  Id.

9

Plaintiff's counsel then questioned the VE. (TR 210). Plaintiff's counsel asked how often the jobs listed would allow for bathroom use. Id. The VE testified that "a person would need to be away from the work site no more than five minutes every hour. Id. Plaintiff's counsel asked whether there would be a place for someone to lie down for about four minutes each hour. Id. The VE testified that the only place would be the bathroom floor. Id.

The ALJ then asked whether production quotas would interfere with being away from the work station five minutes each hour. (TR 211). The VE testified that he

> would find that the employer would generally have expectations of seeing the worker at and around the work site most of the time. Even if one was to perform the work faster, I don't believe it's acceptable for the worker to be winding around away from the work setting for a long period of time.

Id.

## 2.    May 14, 2004 Hearing

Michael Eric Rosko, a vocational expert [VE], testified at the hearing. (TR 225-33). He classified Plaintiff's past work as a motor vehicle assembler for GM as medium and unskilled. (TR 226). The VE testified that Plaintiff did not have any transferable skills. Id. The ALJ presented a hypothetical question to the VE regarding whether a claimant with Plaintiff's age, sex, educational level, and work experience, whose testimony was credible, was capable of Plaintiff's past relevant work. (TR 226-27). The VE testified that Plaintiff would not be capable of doing his past work or any other work due to

> symptoms in his back and neck resulting in significant discomfort in both areas. Because of this, he is limited in his ability to sit, stand, walk, and lift. He indicates he's always uncomfortable. He lays down and stretches typically once per hour for 10 minutes throughout the day to manage his symptoms. If he doesn't do that, he becomes extremely fidgety and nervous. He also indicates an ability to perhaps do light housework for 10 to - - 15 to 20 minutes at a time maximum. He needs to use the restroom on a regular basis, takes significant precautions to manage his bathroom

10

situation in advance.  He indicates that even so he will typically use the restroom four to five times per hour, four to six times per hour.

(TR 227).

The ALJ presented a second hypothetical question to the VE regarding whether a claimant with Plaintiff's age, sex, educational level, and work experience, who

could perform no more than a sedentary or a sit down-type job, one that would allow for changing positions at will, jobs that would not be performed at any unprotected heights requiring any driving, or climbing, or work around dangerous or hazardous machinery, as well as jobs that would allow the most freedom for bathroom use[,]

could perform any jobs.  (TR 227-28).  The VE testified that

two kinds of jobs would meet the parameters of that question.  One type of job would involve what I would call basic industrial processing.  By that, I mean simple assembly, packaging, sorting, and visual inspection work, carried out away from moving conveyors or assembly line situations.  I estimate that  7,000 jobs exist in this region. [INAUDIBLE] of industries, jobs such as this, Your Honor, the worker could be away from the work site up to five minutes per hour outside of scheduled work breaks, but not beyond five minutes per hour.  The other type of work that would exist for such a person, Your Honor, would be entry level, unarmed security work such as lobby attendant, gate attendant, security monitor.  These jobs allow for frequent changing of positions at will.  In terms of bathroom breaks, Your Honor, the person is supposed to be at their post essentially continuously unless they need to use the bathroom.  I would think that a position like that, even being away five minutes per hour on a job like that would be an excessive amount of time.

(TR 228).  The VE testified that regarding the second type of work, 1,500 positions exist.  (TR 229).

In addition, the VE stated that there would be more freedom to use the bathroom with "bench work" than with unarmed security work.  Id.  The VE testified that all the aforementioned jobs were unskilled entry level positions and "typically people become proficient in these kinds of jobs and meet employer expectations within a few days."  Id.  The VE testified that the Dictionary of Occupational Titles [DOT] is "silent on the ability one might have or not to alternate between sitting, or standing, or changing positions at will."  (TR 230).  He stated that his testimony as to the

11

availability for a sit/stand option was based on his experience placing workers in these types of jobs. Id.  In addition, the VE stated that the DOT classifies those jobs under the title of security guard at "the very low end of semi-skilled and at the light exertional level."  He explained that his classification of same at the sedentary and unskilled level was based on his experience placing workers in these types of jobs.  Id.

Plaintiff's counsel then questioned the VE.  (TR 230-31).  Plaintiff's counsel asked whether, based on Dr. Best's limitations in Exhibit 12F, the need to rest for ten minutes each hour, either by stretching or lying down, would preclude all work.  (TR 230).  The VE stated that lying down for ten minutes each hour would preclude all work.  Id.  Upon further questioning by Plaintiff's counsel, the VE reiterated that in light industrial positions the maximum break per hour would be five minutes.  Id.  Further, the VE stated that the need to rest frequently without restriction, if it meant lying down, it would preclude all work.  (TR 231).

The ALJ asked the VE to clarify the need to lie down versus the need to sit down.  Id.  The VE stated that if you are "working as a security guard at Martin Marine [phonetic].  It's a job where you can sit, you can stand, it's a comfortable chair.  You need to sit down and rest, you can sit down and you can still do your job."  Id.  The VE explained the difference between the two types of jobs he described was that in security work, there are no breaks, but "[y]ou can put your feet up."  (TR 232).  The VE stated that with the assembly line work, there are scheduled breaks and you have the option of using a stool and alternating between sitting and standing.  Id.  The VE stated that there is no difference if they sit or lay down when they are away from their work station.  Id.

12

D.      **ALJ'S CONCLUSIONS**

        **1.      January 22, 2002 Decision**

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that "[t]he medical evidence establishes that the claimant is status post fusion of the lumbar spine with instrumentation, moderately severe bilateral L5-S1 radiculopathy, and bowel and bladder dysfunction," but that he does not have an impairment or combination of impairments set forth in Appendix 1, Subpart P, Regulations No. 4.  (TR 168).  The ALJ found Plaintiff's testimony not fully credible.  (TR 167, 168).  He determined that Plaintiff had the RFC to perform "sedentary work with a sit/stand option, no work around heights, no driving, no climbing, no work around hazardous machinery.  In addition, the claimant would require jobs which have freedom to use the bathroom as needed."  (TR 167).[3]  Thus, the ALJ concluded that Plaintiff is not eligible for disability.  (TR 169).

        **2.      September 15, 2004 Decision**

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that "[t]he claimant's back and neck impairments are considered 'severe,'" but that he does not have an impairment as set forth in Appendix 1, Subpart P, Regulations No. 4.  (TR 21, 27).  The ALJ found Plaintiff's testimony not fully credible.  (TR 21-24, 27).  He determined that Plaintiff had the RFC to perform "sedentary or sit down type work, which allows for changing positions at will, and which is not performed at unprotected heights and does not require driving, climbing or working around dangerous or hazardous machinery but allows the most

_____

[3]See also TR 168 (stating that claimant has the residual functional capacity for sedentary work with a sit/stand option, no heights, no driving, no climbing, no work around hazardous machinery and jobs which provide for bathroom privileges).

13

freedom for bathroom use." Id. Thus, the ALJ concluded that Plaintiff is not eligible for disability. (TR 28).

### E.   ANALYSIS

Plaintiff advances two claims in his Motion for Summary Judgment. Plaintiff's Motion argues that the ALJ's decision is not supported by substantial record evidence because (1) the ALJ's failed to properly analyze treating physician's, Dr. Best's, opinion; and (2) the ALJ did not properly assess his credibility.[4] In response, Defendant's Motion for Summary Judgment contends that these aspects of the ALJ's decision are supported by substantial evidence.[5] The matter is now ready for decision.

### 1.   Standard of Review

This Court's review of the ALJ's conclusions is limited. The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g) (2006). Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). It is more than a scintilla of evidence, but less than a preponderance of evidence. Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989). This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed. Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994). Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence. Mullen v.

---

[4]Plaintiff's Motion for Summary Judgment and Brief filed November 22, 2005, (hereinafter Plaintiff's Brief) at pages 7-13. See also Plaintiff's Reply Brief filed January 25, 2006, (hereinafter Plaintiff's Reply).

[5]Defendant's Motion for Summary Judgment and Brief filed January 11, 2006, (hereinafter Defendant's Brief) at pages 11-19.

Bowen, 800 F.2d 535, 545 (6th Cir. 1986). Finally, consideration of the whole record does not mean

that the ALJ must mention or comment on each piece of evidence submitted. Black v. Apfel, 143

F.3d 383, 386 (8th Cir. 1998). Applying these standards, I will analyze each of Plaintiff's claims.

### a.   Treating Physician

Plaintiff argues that the ALJ did not properly analyze the weight to be given his treating

physician, Dr. Best's opinion.[6] This Court is well aware that the medical opinions and diagnoses

of treating physicians are entitled to substantial deference, particularly if those opinions are

uncontradicted. King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).

> The treating physician doctrine is based on the assumption that a medical
> professional who has dealt with a claimant and his maladies over a long period of
> time will have a deeper insight into the medical condition of the claimant than will
> a person who has examined a claimant but once, or who has only seen the claimant's
> medical records.

Bankston v. Comm'r of Soc. Sec., 127 F. Supp. 2d 820, 824 (E.D. Mich. 2000). However, such

deference is due only if the treating physician's opinion is based on sufficient medical data. See 20

C.F.R. § 404.1529. The determination of disability is the prerogative of the Secretary, and not the

treating physician. Kirk v. Sec'y Of Health & Human Servs., 667 F.2d 524, 538 (6th Cir. 1981);

Duncan v. Sec'y of Health & Human Servs., 801 F.2d 847, 855 (6th Cir. 1986); 20 C.F.R. §

404.1527.

An ALJ may reject a physician's opinion when it is brief, conclusory, or not supported by

medically acceptable clinical or laboratory diagnosis techniques. 20 C.F.R. § 404.1527(d)(2).

Xxcite doesn't state thisxx  Accordingly, treating physicians' opinions must be grounded on

objective medical evidence, and no deference need be afforded those opinions if they are simply

---

[6]Plaintiff's Brief at pages 8-11; Plaintiff's Reply at pages 1-2.

conclusory. <u>Houston v. Sec'y of Health and Human Servs.</u>, 736 F.2d 365, 367 (6th Cir. 1984);

<u>Duncan</u>, 801 F.2d at 855 (citing <u>King</u>, 742 F.2d at 973). In other words, the weight to be given a

doctor's opinion by an ALJ will depend on the extent to which it is supported by "specific and

complete clinical findings." <u>Giddings v. Richardson</u>, 480 F.2d 652, 656 (6th Cir. 1973). <u>See also</u>

<u>Cutlip v. Sec'y of Health and Human Servs.</u>, 25 F.3d 284, 287 (6th Cir. 1994) (citing <u>Young v.</u>

<u>Sec'y of Health & Human Servs.</u>, 925 F.2d 146, 151 (6th Cir.1990)).

In <u>Wilson v. Commr. of Soc. Sec.</u>, 378 F.3d 541, 544, (6th Cir. 2004), the Sixth Circuit

found that

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion.

<u>Id.</u> (citations omitted).

The ALJ thoroughly reviewed the evidence relating to Dr. Best and found that

> [d]espite the fact that the claimant told Dr. Best on September 13, 2001, that his back pain was worse with sitting, standing or bending (Exhibit 11F), Dr. Puri noted on August 28, 2000, that the claimant was able tot sit, stand, bend, carry, push, pull, dress, undress, get on and off the examining table, and go up and down the step stool (Exhibit 8F). Dr. Best found the claimant's sitting posture was unremarkable, and he transferred to standing without difficulty (Exhibit 11F). He was able to get on and off the table without difficulty. Walking was unremarkable. He had difficulty with balance when walking on his heels or heel to toe. He could do a 3/4 squat, three heel pumps on the right and six on the left. Dr. Puri noted that the claimant was able to stoop, but has difficulty coming back to a standing position accompanied by a tendency to lose balance but he did not need a supporting aid. Dr. Puri further noted that functionally, the claimant was going to have a problem in any type of job situation where he has to walk any prolonged distance, go up and down stairs, and do any type pf prolonged lifting or carrying, which is consistent with the residual functional capacity, as determined.
> On September 13, 2001, Dr. Best noted that the claimant was independent in self-care skills (Exhibit 11F, p. 2) He could do all the normal chores at home. His

girlfriend helped with chores. He was unable to go hunting. If he lies down, he feels better or in the changes of position.

On October 12, 2001, Dr. Best issued a Physical Capacities Evaluation wherein he noted that the claimant could sit, stand and/or walk less than one hour in an eight hour day, could occasionally lift up to five pounds but never more than five pounds, could not use his hands for repetitive actions such as simple grasping, pushing and pulling of arm controls or fine manipulation, could not use his feet for repetitive movements as in pushing and pulling of leg controls, required an extra 10 minute rest period per hour in addition to minimum rest periods required in addition to a 30 minute lunch and should be allowed to lie down for substantial periods of time during the day due to limited endurance and pain (Exhibit 12F). However, this assessment is more restrictive than even the claimant's testimony at the first hearing, which indicated a capacity for sitting and/or standing for one hour each, walking for two blocks, and lifting up to 20 pounds on an occasional basis. Also, the claimant acknowledged that he would be able to work with limitations.

On November 13, 2001, Dr. Best, again, totally and permanently disabled the claimant (Exhibit B-13F).

In contradiction with his disability conclusion dated May 29, 2003, Dr. best noted that the claimant continued to be independent in self-care activities although, he could not climb a ladder or do other activities that involve balance (Exhibit B-14F). He could do five heel pumps on the right and three on the left (Exhibit B-14F). . .

On May 6, 2004, Dr. Best completed a second Physical Capacities Evaluation (exhibit B15F). He reduced the amount of time the claimant was able to sit, stand, and/or walk to less than one hour each in an eight hour work day. However, Dr. Best increased the claimant's ability to lift, on a sustained basis up to 10 pounds occasionally. Dr. Best indicated that the claimant required complete freedom to rest frequently without restriction. It was necessary for the claimant to lie down for substantial periods of time during the day based on the MRI, physical exam and surgical fusion of L3 ans S1. . . .

The opinions of Dr. Best are based on seeing the claimant once or twice a year. The claimatn [sic] stopped treating with any doctors because he did not think treatment would help his condition change (Exhibit 7F, p. 2). Rather, the claimant testified that he is able to and does perform exercises including stretches. On August 14, 2001, it was noted that the claimant was "to retire" from "GMC" (Exhibit 10F, p. 1). The infrequent treatment of the claimant since his retirement is contrary to the claimant's chronic pain complaints.

Dr. Best's report dated September 13, 2001 is incomplete in several respects. For example, it does not list what the claimant's multiple pains are in the first paragraph (Exhibit 11F, p. 1). Second, Dr. Best indicated that they "were unable to find a job that would 'need' the restrictions" (Exhibit 11F, p. 1). Third, the report does not indicate how many weeks ago it was that the claimant developed shoulder pain. Last, Dr. Best noted his plan was "Total permanent disability" (Exhibit 11F, p. 4). It is apparent rom [sic] these contradictions that Dr. Best was assisting the claimant in obtaining a disability retirement from his past employer. Dr. Best notes that the

employer could not place the claimant in a job that would met [sic] the claimant's restrictions.  Dr. Best's opinion on the claimant's functional limitations that are supported by objective medical evidence will be considered but his conclusions as to disability will not be given any weight.

(TR 22-24).  This analysis of the treating physician essentially complies with the recent decision in Wilson.  Although the ALJ did not note Dr. Best's specialty, physical medicine and rehabilitation, this is harmless error.  It is possible under Wilson to have harmless error.

> If a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal. Cf. NLRB v. Wyman-Gordon, 394 U.S. 759, 766 n.6, 89 S. Ct. 1426, 22 L. Ed. 2d 709 (1969) (plurality opinion) (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game"). There is also the possibility that if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant. Or perhaps a situation could arise where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation.

Wilson, 378 F.3d at 547.  In this case, because the omitted factor was the treating physician's specialization under Wilson, "remand would be an idle and useless formality." Id. (citation omitted).

### b.    Credibility

Plaintiff argues that the ALJ failed to properly assess his credibility.[7]  The ALJ's credibility determination is analyzed under 20 CFR § 404.1529(c)(3).  That regulation states that

> [w]hen determining credibility, in addition to the objective medical evidence, the ALJ must also consider:
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other

---

[7]Plaintiff's Brief at pages 11-13, Plaintiff's Reply at pages 2-3.

18

symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 minutes to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 CFR § 404.1529(c)(3). Further, the regulations clearly set forth that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."  20 CFR § 404.1529(c)(2).  In addition, as Social Security Ruling (SSR) 96-7p points out, the ALJ's "determination or decision must contain specific reasons for the finding on credibility . . . to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. Jul. 2, 1996).  See also Murray v. Comm'r of Soc. Sec., No. 01-10020-BC, 2004 WL 1765530, at *4 (E. D. Mich., Aug. 3, 2004).

The ALJ in this case stated the following in assessing credibility:

[t]he claimant takes pain medication and testified that his medications cause bladder and bowel problems and fatigue.  However, allegations of medication side effects must be substantiated by objective medical evidence.  Duncan v. Secretary of HHH, 801 F. 2d 847 (6th Cir. 1986).  In the instant case, the treating physician noted bowel and bladder dysfunction but had not indicated that this was the result of medication side effects.  The claimant did complain to the evaluating physician, in August 2000, that his medications caused some degree of fatigue 9Exhibit 8F)  Rather, he testified at the second hearing that Celebrex and Flexeril take the edge off his pain.  However, none of these side effects alleged by the claimant are disabling.

19

The claimant testified at the first hearing that he experienced chronic low back pain and that he was unable to stand for eight hours. He acknowledged that he was able to perform some light chores and yard work and that he could work within limitations but that he did need to lie down throughout the day. He testified that he is able to sit for one hour, stand for one hour, walk two blocks, and lift 20 pounds but not on a repetitive basis. He also complained of bladder and bowel problems such that one a bad day, he would require the use of a bathroom two times an hour. On a good day, he testified that he would use the bathroom once an hour.

The claimant testified that he does light chores including straightening things up and washing the dishes, which take 15 to 20 minutes. He was able to drive himself to the hearing although he usually limits driving to 45 minutes. He takes short trips to the store to get milk and bread. He testified that he can go out up to three hours at a time, which is inconsistent with his testimony of the necessity to have bathroom breaks every 10 to 15 minutes. he arose early in order to be able to attend his hearing so he would be able to go to the bathroom two to three times before he left his home. After being away from his home for two and one half hours, he described that he was uncomfortable, in pain, nervous, jittery and needed to stretch out a bit... (TR 21-22).

The clinical findings to do [sic] not substantiate the need to lie down throughout the day and the treating physician has consistently indicated that the claimant could work within limitations.

On May 29, 2003, the claimant did not grimace, verbalize pain or exhibit tremors. there was no expression of pain with light touch or skin fold pinching. Dr. Best noted that the claimant's back pain symptoms were aggravated by sitting and standing (Exhibit B-14F)....

At the second hearing, the claimant testified that his back pain was the same as it had been before. He testified that he was uncomfortable, fidgety, and nervous no matter what he does. He needs to lie down on the floor to stretch once during the day for 10 minutes. However, his functional ability was reduced to where he could sit about 15 minutes before he has to get up, change positions, and walk around; stand for 15 minutes before he has to get up, bend and sit down; walk for about 15 minutes; and lift about 10 pounds. In addition, he was able to sit at the 25 minute hearing without having to get up or stand to stretch. (TR 24).

Plaintiff points out that the ALJ does not support his disregard of Plaintiff's need to lie down with any evidence of record.[8] Again, the ALJ stated, "[t]he clinical findings to [sic] do not substantiate the need to lie down throughout the day and the treating physician has consistently indicated that the claimant could work within limitations." (TR 24). The ALJ

---

[8]Plaintiff's Brief at page 11.

does not clarify what treating physician or what "clinical findings." However, Plaintiff's own testimony in this regard is inconsistent, as the ALJ pointed out at the second hearing, Plaintiff testified to a need to lie down only ten minutes once a day.  (TR 24).

Plaintiff also argues that he only sees Dr. Best once or twice a year because there is nothing that Dr. Best can do for him and that he refuses to take stronger narcotic medications.[9]  Plaintiff cites to Plaintiff's testimony for the preposition that Dr. Best could not do anything for him.[10]  However, Dr. Best's notes do not indicate that he could not provide such a lack of treatment.

The standard is substantial evidence and it appears that the ALJ's credibility analysis is supported by same, even though this may be a close call.  The undersigned recognizes that

> after listening to what [Plaintiff] said on the witness stand, observing [his] demeanor, and evaluating that testimony in the light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [Plaintiff] was trying to make his symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment.

Gooch v. Sec'y of Health and Human Servs., 833 F.2d 589, 592 (6th Cir. 1987).  Further, the "ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference," Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997) (citation omitted), and should therefore not be disturbed.

## III.   CONCLUSION

For the reasons stated, I find that the ALJ's decision denying Plaintiff benefits is substantially supported in the record.  Accordingly, I respectfully recommend that the Court

---

[9]Plaintiff's Brief at a pages 11-13.

[10]Plaintiff's Brief at pages 12-13 (citing TR 217).

**DENY** Plaintiff's Motion for Summary Judgment, **GRANT** Defendant's Motion for Summary Judgment, and enter judgment for Defendant Commissioner.

Pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objections within ten days after being served with a copy thereof.  The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals.  United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed. R. Civ. P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.

s/Wallace Capel, Jr.
**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**Dated:**   August 15, 2006

22

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on <u>August 15, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Janet L. Parker,</u>

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Social Security Administration, Office of the Regional Counsel, 200 W. Adams Street, 30th Floor, Chicago, Illinois 60606; Marc W. Mulder, Clayton, Mulder, 3135 Dixie Highway, Waterford, MI 48346</u>.

<u>s/James P. Peltier</u>
United States District Court
Flint, Michigan 48502
810-341-7850
E-mail: pete_peltier@mied.uscourts.gov

23